# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **BERNARD FORREST,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Hon. Blanche M. Manning** |
| **vs.** | ) | |
| | ) | **04 C 4666** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Bernard Forrest ("Forrest"), brings this action, pursuant to the Social Security Act ("the Act"), seeking judicial review of a final agency decision of Defendant Jo Anne B. Barnhart, Commissioner of the Social Security Administration ("the Commissioner"), which found him not disabled and therefore not entitled to Supplement Security Income ("SSI"). The present matter is currently before the Court on: (1) Forrest's Motion for Remand, pursuant to 42 U.S.C. § 405(g); and (2) the parties' cross motions for summary judgment, pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the Court denies the Commissioner's motion for summary judgment, and grants Forrest's motion for remand.

## I.      PROCEDURAL HISTORY

On May 26, 1999, Forrest, claiming that he had been disabled since December 31, 1991, applied for Disability Insurance Benefits ("DIB") and SSI. (R. at 19, 73). In the application, Forrest contended that he suffered from high blood pressure, arthritis, and back pain. (R. at 33). On July 8, 1999, the Commissioner denied Forrest's request for DIB and SSI. (R. at 33).

Forrest filed a timely request for reconsideration that was subsequently denied on October 8, 1999.  (R. 38).

On October 20, 1999,  Forrest filed a request for hearing.  (R. 161).  The hearing was scheduled to take place on June 20, 2000 before Administrative Law Judge ("ALJ") Cynthia M. Bretthauer, but Forrest appeared late.  (R. 161- 62).  On June 26, 2000, the ALJ, having found that  Forrest did not have good cause for not appearing at the hearing on time, dismissed Forrest's  request for hearing.  (R. 162).  On October 5, 2001, the Social Security Administration Appeals Council ("Appeals Council") found that  Forrest had good cause for being late to the scheduled hearing and remanded the case to the ALJ for a hearing.  (R. 170).

At the hearing held on February 12, 2002,  Forrest, through his attorney, withdrew the request for hearing as it pertained to the DIB application.  (R. 217).  Accordingly, only Forrest's application for SSI was addressed.  (R. 217).  On February 25, 2002, the ALJ issued a decision denying Forrest's request for SSI.  (R. 19-26).  The denial was based on the ALJ's finding that although  Forrest was incapable of performing his past relevant work due to limitations caused by his impairments, he was able to perform a significant number of jobs in the national economy and was therefore not disabled at any time through the date of the decision.  (R. 19-26).

Forrest filed a request with the Appeals Council to review the ALJ's decision.  (R. 217). The Appeals Council denied  Forrest's request on October 31, 2003.  (R. 211).  The ALJ's decision stands as the final decision of the Commissioner.  (R. 211).  After the Appeals Council denied his request for review, Forrest brought this instant action appealing the denial of his request.

2

II.    **STATEMENT OF FACTS**

A.    **Evidence Presented at the Hearing Before the ALJ**

1.    **Forrest's Testimony**

At the hearing, Forrest testified to the following.  Forrest had attended high school but

stopped after he had completed the eleventh grade because he had started working.  (R. 249).

Forrest stated that he lived with his sister in Chicago, Illinois and that he paid her one hundred

dollars a month for living there.  (R. 248).  The money he paid his sister came from the income

he received from General Assistance.  (R. 248).  Forrest stated that his sister did most of the

cooking and laundry, (R. 262) and that he did very little cleaning and grocery shopping, (R. 262)

but sometimes washed the dishes or mowed the lawn.  (R. 262).  He also was able to bathe and

dress himself.  (R. 262).  He was also able to shovel the snow "a little bit," and stated that he

always cleaned the snow from the stairs and walkway.  (R. 262-63).  However, Forrest testified

that his brother "mostly" came to shovel if Forrest did not do it.  (R. 263).  Forrest also stated

that for exercise, he walks, uses a ball to exercise the joints in his shoulders, and uses handgrips

to strengthen his hands.  (R. 263).

Forrest had been employed as a truck driver, but at the time of the hearing, he did not

have a driver's license because it had expired.  (R. 249).  During his testimony, Forrest stated that

he had been out of work since 1991 because of back problems.  (R. 249).  Although Forrest

indicated that he had not been able to drive a truck due to his back problems, he performed "odds

and ends work, like painting" for people that he knew.  (R. 249-50).  Forrest claimed that he was

prevented from doing light work because his back pain would not allow him to stand or sit for a

long time.  (R. 250).  The last time Forrest performed an "odds and ends" job was about seven

3

months prior to the hearing when he started painting the inside of a church. (R. 251). Forrest

testified that after three or four days of painting the church, he could not complete the job

because he had "pulled a sharp pain" in his back. (R. 251). Since the church painting job,

Forrest claimed that his back pain and the inability to bend had prevented him from working. (R.

251).

Forrest stated that he had seen two different doctors, Dr. Santos and Dr. Innocencio, with

Dr. Innocencio being his primary doctor. (R. 251-52). Forrest stated he had been seeing Dr.

Innocencio since 1996, and the records before the ALJ indicate that Forrest began seeing Dr.

Santos in June of 1997. (R. 252). Forrest testified that he saw two different doctors because they

were in the same clinic and he would see whomever was available. (R. 252). Forrest stated that

it was possible that the last time he had seen Dr. Santos was in February of 2000. (R. 253). He,

however, saw Dr. Innocencio every month to get his medication and to discuss his health. (R.

253). Forrest claimed that he took his medicine everyday. (R. 253). He also testified that he had

not been able to have x-rays taken, like Dr. Innocencio had suggested, because he only had a

General Assistance card and the hospitals would not provide an x-ray with that card. (R. 255).

Forrest stated that his doctors had diagnosed him with "gouty type arthritis" and he took

an anti-inflammatory medication (Indocin) that provided him with relief.[1] (R. 254). He stated

that he did not take Indocin everyday, but only when he experienced flare-ups. (R. 254). He also

testified that he did not take a prescription pain medication but sometimes he would take a Bayer

aspirin. (R. 255). He claimed that he had experienced gout flare-ups about twice a month which

---

[1] Forrest did not state the kind of relief the medicine provides. He only stated that the
medication "helps a lot." (R. 254).

lasted for three days per flare-up.  (R. 256-57).  These flare-ups affected him mostly in his feet

and he stated that he could not place pressure on them during an episode.  (R. 257).  He also

stated that the flare-ups were very painful and caused his knees and hands to swell during an

episode.  (R. 257).  Forrest stated that he soaked his knees and placed ice on his hands and arms

when he would have a flare-up episode.  (R. 257).  When his hands were swollen, Forrest

claimed that he lost control of his fingers.  (R. 257).  Forrest stated that, during a flare-up,  he

took his medication and laid down for a couple of hours.  (R. 265).  Besides taking medicine for

the gout flare-ups, Forrest claimed that his doctor gave him some cream that he usually placed on

his back.  (R. 259).  Forrest did not have any side-effects from the medication he took.  (R. 259).

When Forrest was not having a flare-up, he stated that he could walk about a mile but he

would have to stop and rest after every two blocks.  (R. 262).  However, during a flare-up,

Forrest stated that he could not walk without assistance.  (R. 260).  Forrest used a non-prescribed

cane to assist him with walking during a flare-up.  (See R. 260).  Forrest claimed that he could

stand for a half an hour, sit for forty-five minutes to an hour, and lift 50-60 pounds.

## 2.    Vocational Expert's Testimony

Christopher Yep, a vocational expert ("VE"), testified at Forrest's hearing.  The VE

began by describing Forrest's past relevant work as "that of the truck driver, it is a semi-skilled

occupation, it ranges in terms of exertional levels from light to medium."  (R. 266).  He further

stated that the job had transferable skills to a sedentary job and that there were approximately

2,000 sedentary truck driving jobs available in the State of Illinois.  (R. 267).  The ALJ then

provided a hypothetical to the VE in which she described to him a person fifty-years old with the

same past work experience and education as Forrest.  (R. 267).  The hypothetical assumed that

5

the person could sit for six hours; stand and walk for six hours; lift and carry frequently up to twenty-five pounds, and occasionally up to fifty pounds.  (R. 267).  The ALJ asked the VE further to assume that the person could only occasionally stoop.  (R. 267).  The VE testified that the hypothetical individual could perform Forrest's past work.  (R. 267).  The ALJ asked the VE further to assume that instead of the previous exertional level, the individual could lift and carry frequently up to ten pounds, occasionally up to twenty, and occasionally stoop.  (R. 267).  The VE testified that the hypothetical person also could perform Forrest's past work.  (R. 267).

The ALJ then asked the VE what would happen if the person needed to stand approximately every forty-five minutes to one hour.  (R. 267).  The VE testified that this hypothetical person would not be able to perform Forrest's past work because driving the truck would require longer periods of sitting.  (R. 267).  However, the VE gave examples of three different jobs that the hypothetical individual could perform.  (R. 268).  First, he could perform work as a cashier; there are approximately 32,289 positions available in Illinois.  (R. 268).  Second, he could work as a sorter; there are approximately 9,783 positions available in Illinois.  (R. 268).  Third, he would work as an assembler; there are approximately 26,198 positions available in Illinois.  (R. 268).

The ALJ further asked the VE to assume that the individual could not stand or walk more than two hours out of the day.  (R. 268).  In response, the VE stated that the hypothetical individual would be limited to sedentary work.  (R. 268).  The ALJ finally asked the VE to assume Forrest's statements regarding his restrictions and limitation were accurate, including his testimony that twice a month, for up to three days each time, he was basically unable to perform any kind of work due to his gout flare-ups.  (R. 268).  The VE testified that there would not be

any full-time jobs for this hypothetical individual.  (R. 268).

Forrest's attorney then questioned the VE.  Forrest's attorney inquired about the exertional levels of a cashier, assembly, and sorter.  (R. 270).  The VE responded that the exertional levels were "actually sedentary numbers."  (R. 270).  Forrest's attorney clarified with the VE that the sedentary driving position was not the exact same as Forrest's past work in that it had a different job title.  (R. 269).  The VE also testified that while the sedentary driving position was unskilled, and Forrest's past work was skilled, he still felt that it was an "acceptable position to suggest" given that both positions required driving.  (R. 269-70).

### 3.  Medical Evidence

#### a.  Dr. Santos

Dr. Santos, an internist and one of Forrest's treating physicians, examined Forrest on May 20, 1999, and on June 9, 1999, Dr. Santos prepared a cardiac report, arthritic report, and a spinal disorder report on Forrest.  (R. 113-20).  In the cardiac report, Dr. Santos diagnosed Forrest with hypertension with an onset date of several years ago.  (R. 113).  Dr. Santos' cardiac report did not place any restrictions on Forrest's ability to engage in physical activity.  (R. 114).  Additionally, Dr. Santos stated in the cardiac report that there were no significant limitations on Forrest's ability to perform daily living activities such as performing household duties (e.g., cooking, dusting, making beds), grocery shopping, taking out the garbage, walking one or two blocks, climbing one flight of stairs, etc.  (R. 115).

In the arthritic report, Dr. Santos diagnosed Forrest with osteoarthritis of the ankle with an onset date of September 1998.  (R. 117).  Dr. Santos stated that Forrest had clinical abnormalities of local swelling in both ankles.  (R. 117).  Forrest did not have any handling or

7

fingering manipulative limitations. (R. 118). Dr. Santos noted that Forrest's ankle had thirty

degrees of extension and flexion. (R. 118). Forrest's ambulation was normal and he was able to

walk more than fifty feet without assistance. (R. 118). Dr. Santos indicated that Forrest's ability

to stand for a long period of time was significantly limited. (R. 118).

In the spinal report, Dr. Santos diagnosed Forrest with chronic back pain with an onset

date of "several years ago." (R. 119). Forrest had normal flexion and extension in his cervical

spine with no paravertebral muscle spasm. (R. 120). However, Dr. Santos noted that Forrest

was able to flex his lumbosacral spine 30 degrees (ninety degrees being normal) and extend his

lumbosacral spine 20 degrees (thirty degrees being normal). (R. 120). Dr. Santos also noted that

Forrest had paravertebral muscle spasm in the lumbosacral spine area. (R. 120).

After an examination on September 16, 1999, Dr. Santos filled out another cardiac report,

arthritic report, and spinal disorder report on Forrest on September 22, 1999. (R. 129-36). There

were no significant changes between Dr. Santos' June 9, 1999 and September 22, 1999 cardiac

reports. (Cf. R. 113-16 with R. 133-36). In the arthritic report, there were also no significant

changes. Dr. Santos again answered that Forrest had significant limitations on standing, lifting,

and carrying. (R. 130). There were also no significant differences between Dr. Santos' June 9,

1999 and September 22, 1999 spinal reports except that the September 22 report stated that

Forrest was "sent for x-ray L-S [lumbosacral] spine." The September 22 spinal report also noted

that Forrest had "significant limitation of standing, moving about, lifting [and] carrying." (R.

133).

### b.     Dr. Innocencio

Dr. Innocencio is a general practitioner and Forrest's primary treating physician. Dr.

Innocencio examined Forrest on November 12, 2001. (R. 198). In a December 2001 handwritten report, Dr. Innocencio stated that he began treating Forrest on August 27, 1996, and had seen Forrest approximately once a month since then. (R. 198). On December 8, 2001, Dr. Innocencio also completed a multiple impairments questionnaire ("MIQ"). (R. 198). In the MIQ, Dr. Innocencio diagnosed Forrest with hypertension, gouty arthritis (osteoarthritis), and status post syphilis. (R. 198). Dr. Innocencio characterized Forrest's prognosis as fair. (R. 198).

In support of his prognosis, Dr. Inocencio pointed to swelling and stiffness of the right knee, stiffness of the lumbar area, and difficulty ambulating during an attack. (R. 198). Dr. Innocencio listed Forrest's primary symptoms as pain and stiffness of the lower back; pain, stiffness, and swelling of the right knee; and tingling sensation of the right foot. (R. 199). Dr. Innocencio concluded that Forrest's symptoms and functional limitations were reasonably consistent with his physical impairments described in the MIQ. (R. 199).

According to Dr. Innocencio, Forrest experienced some sharp pain, but mostly stiffness in his back and right knee. (R. 199). This pain occurred once every other month. Dr. Innocencio described the pain as moderately severe but concluded that medicine was able to completely relieve the pain. (R. 199). Additionally, Dr. Innocencio described Forrest's level of fatigue as mild. (R. 199).

In estimating Forrest's residual functional capacity ("RFC"), the doctor concluded that Forrest could lift and carry 20 to 50 pounds occasionally and sit 3 hours and stand/walk 1 hour in an 8-hour day. In addition, he opined that Forrest should not sit continuously in a work setting and that Forrest needed to get up and move around every 2 to 3 hours and sit again after 30 minutes. (R. 200-01). Additionally, Dr. Innocencio concluded that Forrest had no significant

9

limitations doing repetitive reaching, handling, fingering or lifting, and had no significant limitations using his upper extremities. (R. 201-02). Dr. Innocencio stated that Forrest would periodically experience pain, fatigue or other symptoms severe enough to interfere with attention and concentration. (R. 203). Finally, Dr. Innocencio concluded that Forrest would need to take unscheduled breaks to rest at unpredictable intervals during an 8-hour workday. (R. 203). Dr. Innocencio estimated that this would happen once a month and that Forrest would have to rest until the swelling, pain, and stiffness resided before returning to work. (R. 203). Dr. Innocencio further estimated that on average Forrest was likely to be absent about once a month from work as a result of the impairments or treatment. (R. 204). Dr. Innocencio also noted that Forrest had no limitations unless he was having pain and swelling. (R. 204).

     c.    **Dr. Bone**[2]

On July 7, 1999, Dr. Bone, a physician employed by the State Disability Determination Services, performed an RFC assessment using the information that was contained in Forrest's file.[3] (R. 121). Dr. Bone concluded that Forrest could lift and/or carry 20 pounds occasionally; lift and/or carry 10 pounds frequently; stand and/or walk for a total of 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and push and/or pull with no limitations other than his lift and/or carry limitations. (R. 121A). Dr. Bone also stated that Forrest could occasionally stoop. (R. 122).

---

[2]The court notes that in her decision, the ALJ refers to the conclusions reached by the "*physicians* [plural] employed by the State Disability Determination Services...." (R.23). However, the record includes only one report from one DDS physician, Dr. Bone.

[3] Based on the date of Dr. Bone's report, it appears that neither Dr. Innocencio's December 2001 report nor Dr. Santos' September 1999 report were part of the file at the time Dr. Bone made his RFC assessment.

Dr. Bone concluded that: (1) Forrest's symptoms were attributable to a medically determinable impairment; and (2) that the severity and duration of Forrest's symptoms were consistent with Forrest's diagnosis; and (3) that the severity of Forrest's symptoms and their alleged effect on his abilities were consistent with the total medical and non-medical evidence, including statements by Forrest and others, observations regarding the activities of daily living, and alterations of usual behavior or habits. (R. 125). Dr. Bone also indicated that a treating source statement regarding Forrest's physical capacities was in the file he reviewed. (R. 126).[4] Dr. Bone concluded that there were no treating source conclusions about Forrest's limitations or restrictions that were significantly different from his own findings. (R. 126).

**B.     The ALJ's Decision**

1.     *Standard for Establishing Disability and the Sequential Evaluation*

In order to establish disability, the plaintiff must show that he is unable to engage in any substantial gainful activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Further, plaintiff's impairments must also prevent him from not only doing his previous work, but any other work existing in significant numbers in the economy. 42 U.S.C. § 1382c(a)(3)(B). Plaintiff bears the ultimate burden of proof on disability. 20 C.F.R. § 416.912(a); *Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987).

To determine whether the claimant has a disability in accordance with the Social Security Regulations, the Commissioner uses a five-step sequential analysis to determine whether the

---

[4]The court assumes that this statement refers to Dr. Santos' June 9, 1999 report.

11

plaintiff: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) meets or equals an impairment in the Listing of Impairments; (4) has a sufficient Residual Functional Capacity ("RFC") to perform his past work; and (5) has a sufficient RFC to perform other work in the national economy. *See* 20 C.F.R. § 416.920(a)(4). The ALJ considers each step and if it can be determined that the plaintiff is either disabled or not disabled at a specific step, the Commission will make its determination and will not go on to the next step. *Id.* Once plaintiff reaches Step Five, the Commissioner has the burden of proving that there are jobs in the national economy that plaintiff can perform.

2.    *The ALJ's Decision*

On February 25, 2002, the ALJ found that Forrest was not disabled and therefore not eligible for SSI. (R. 26). The ALJ evaluated Forrest's and the VE's testimonies. (R. 23-25). She stated that she also considered all medical opinions in the record regarding the severity of Forrest's impairments. (R. 25).

The ALJ found that Forrest was closely approaching advanced age and had a limited education. (R. 26). She also found that Forrest had no transferable skills from any past relevant work and/or transferability of skills was not an issue in this case. (R. 25). The ALJ concluded that Forrest had not engaged in any substantial gainful activity since the application date. (R. 25). The ALJ further determined that Forrest's impairment was severe, based upon the requirements in 20 C.F.R. § 416.920(b), but that his impairments nonetheless did not meet, or medically equal, one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (R. 25).

The ALJ concluded that Forrest described daily activities that were not limited to the

12

extent one would expect, given his complaints of disabling symptoms and limitations. (R. 23). The ALJ considered Forrest's treatment routine and/or conservative in nature and noted that there were significant gaps in Forrest's treatment history. The ALJ also noted that Forrest had not seen a specialist. (R. 23). Accordingly, the ALJ concluded that Forrest had not generally received the type of medical treatment one would expect for a totally disabled individual. (R. 23).

In evaluating Dr. Innocencio's opinion, the ALJ listed five reasons for not adopting it. (R. 23). First, she stated that Dr. Innocencio's course of treatment had not been consistent with what one would expect if Forrest was truly disabled. (R. 23). Second, the ALJ noted that other evidence in the record did not substantially support Dr. Innocencio's opinion. (R. 23). Third, she mentioned that Dr. Innocencio's reports failed to reveal the type of significant clinical and laboratory abnormalities one would expect if Forrest was disabled. (R. 23). Fourth, she stated that Dr. Innocencio heavily relied on Forrest's subjective report of symptoms and limitations, and uncritically accepted them as true. (R. 23). Finally, the ALJ stated that Dr. Innocencio was a general practitioner who did not specialize in treating back conditions. (R. 23).

In addition, the ALJ found that Forrest retained an RFC for a range of unskilled, light work.[5] At Step Four, the ALJ found that Forrest would not be able to return to any of his past work because the exertional requirements exceeded his current RFC. Since Forrest's limitations did not allow him to perform the full range of light work, the ALJ alternatively relied on the Medical-Vocational Guidelines ("Grid") as a framework for decision-making in conjunction with

---

[5]Forrest challenges the ALJ's determination that he could perform light work. Under the regulations, Forrest, based on his age, education, and past work experiences, would be found to be disabled if he were limited to sedentary work. *See* 20 C.F.R. Part 404, subpart P, Appendix 2, Table No.1, 201.10.

13

the VE's testimony. (R. 26). At Step Five, the ALJ, in considering Forrest's history, background, RFC, and the vocational expert's testimony, determined that Forrest could perform a number of other jobs in the national economy. Based on the VE's testimony, the ALJ concluded that Forrest could qualify for approximately 32,289 cashier jobs, 9,783 sorter jobs, and 26,198 assembler jobs. (R. 26). As a result of the above-listed findings, the ALJ determined that Forrest was not disabled, as defined in the Act, at any time up to February 25, 2002. (R. 25).

## III.  STANDARD OF REVIEW

The Court's review of the Commissioner's decision is governed by 42 U.S.C. § 405(g). Section 405(g) provides that the findings of the ALJ are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quotations omitted). "Substantial evidence may be less than the weight of the evidence ... and more than a scintilla." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citations and quotations omitted). Even if there is adequate evidence in the record to support the decision, the findings will not be upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

The Court may not decide facts anew, reweigh the evidence, resolve conflicts in evidence, or decide questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Instead, the Court's review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence in the record to support the findings. *Scivally v. Sullivan*, 966 F.2d 1070, 1075 (7th Cir. 1992). With these standards in mind, the Court now addresses the parties' motions.

14

## IV.    DISCUSSION

Forrest argues that: (1) the ALJ's assessment of his physical capacity was erroneous; (2) the ALJ erred in crediting the assessment of the non-examining reviewing physician over that of the treating physician; (3) the ALJ impermissibly played doctor when she failed to recontact the treating physician to resolve inconsistencies; and (4) the ALJ improperly assessed Forrest's credibility.

## A.    RFC Assessment

Forrest first argues that the ALJ erred when she found that he had the RFC to perform a significant range of light work and that her decision was not supported by substantial evidence. The Commissioner, on the other hand, argues that substantial evidence supported the ALJ's RFC finding. The RFC finding is an administrative assessment of what an individual can still do despite his or her limitations. 20 C.F.R. § 416.945; SSR 96-8p. The determination of a claimant's RFC is a decision reserved to the ALJ. 20 C.F.R. §§ 416.946 and 927(e). The ALJ determined that Forrest retained the RFC to do a significant range of light work. This finding must be supported by substantial evidence in the record.

### 1.    ALJ's Assessment of Forrest's Physical Capacity

Forrests' first argument as to the ALJ's assessment of Forrest's physical capacity is difficult to interpret. Forrest argues that the RFC determination was legally erroneous because "[p]laintiff has an RFC for no more than a range of sedentary work and he was entitled to a finding of 'disabled' under the Commissioner's Medical-Vocational Guidelines." In support, at several points in his motion, Forrest reiterates that "[p]laintiff is limited to the sedentary level." The basic factual premise supporting this argument, however, is conclusory and thus does not require the court to find that the ALJ erred in determining Forrest's RFC.

15

2.    *ALJ's Reliance on VE's Testimony in Concluding that Step Five was Satisfied*

Forrest also appears to be arguing that the ALJ's determination as to Forrest's RFC is not supported by the VE's testimony (i.e., is not based on substantial evidence). Upon finding that Forrest's past work would require him to perform activities in excess of his RFC, the burden shifted at Step Five to the Commissioner to establish that Forrest could still perform work existing in significant numbers in the national economy. *See* 20 C.F.R. § 416.960(c). Based on the VE's testimony, the ALJ concluded that such work existed.

Specifically, at the hearing, the ALJ provided a hypothetical to the VE in which she described to him a fifty-year old person with the same past work experience and education as Forrest. The hypothetical assumed that the person could perform light work and that the person required an option to stand approximately every forty-five minutes to one hour. The VE testified that this hypothetical person would *not* be able to perform Forrest's past work because the operation of a truck would require longer periods of sitting. However, the VE gave examples of three different jobs that the hypothetical individual could perform and which existed in significant numbers in the economy including a cashier, a sorter, and an assembler.

The ALJ relied upon this testimony by the VE in determining that Step Five was satisfied and Forrest was "capable of making a successful adjustment to work that exists in significant numbers in the national economy." R.25. However, as noted by Forrest, upon further questioning by Forrest's attorney, the VE acknowledged that the jobs and numbers he provided were for sedentary work, not light work. Forrest contends that because the jobs and numbers the VE provided were actually for sedentary work and not light work, the ALJ erred in finding Forrest not disabled on the ground that he could perform a range of light jobs.

Forrest is technically correct that the VE testified as to jobs and numbers with respect to a sedentary position and not a light work position. No other testimony was provided by the VE as to the existence of jobs in the national economy. Thus, the numbers relied upon by the ALJ were not applicable to Forrest's RFC (i.e., light work). Accordingly, the court concludes that substantial evidence did not support the ALJ's determination at Step Five that light work positions existed in significant numbers in the national economy that Forrest could perform.

3.      *ALJ's Consideration of the Medical Evidence*

In determining that Forrest was able to perform light work and thus was not disabled, the ALJ relied upon the opinion of the State Agency physician, Dr. Bone. Dr. Bone reviewed Forrest's medical records and did not personally examine him. Dr. Innocencio's December 2001 report was not in Forrest's file when Bone reviewed it. Bone opined that Forrest could perform light work. The ALJ stated that Dr. Bone's opinion deserved "some weight, particularly in a case like this in which there exists a number of reasons to reach similar conclusions." (R. 23).

a.      Dr. Innocencio

As to the opinion of Dr. Innocencio, the treating physician, the ALJ properly noted that more weight is generally given to the opinion of a treating physician. 20 C.F.R. § 416.927(d)(2). However, after so noting, the ALJ declined to adopt Dr. Innocencio's opinion.

The ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Moreover, "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and not inconsistent with other substantial

evidence in the record." *Id.* The ALJ must not substitute her own judgment for a physician's opinion without relying on other medical evidence or authority in the record. *Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996).[6] The court concludes that the ALJ's reasons for not adopting Dr. Innocencio's opinion are not supported by the record.

Here, the ALJ gave several reasons why she rejected Dr. Innocencio's opinion. First, she stated that the course of treatment was not what one would expect if Forrest were truly disabled. However, she failed to point to any medical evidence, report or opinion in the record that supported this conclusion. *See Scivally,* 966 F.2d at 1077 (finding lack of substantial evidence where ALJ did not rely on any medical report or opinion in finding that claimant's limitations described by the physician could not be produced by claimant's medical conditions).

The ALJ also stated that Dr. Innocencio's opinion was not substantially supported by other evidence. In support, the ALJ noted that Dr. Innocencio's report failed to reveal significant clinical and laboratory abnormalities one would expect if Forrest were actually disabled. Again, the ALJ failed to cite to any evidence, report or opinion in the record that supported her conclusion. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (acknowledging that an "ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record"). Tellingly, the Commissioner's response merely reiterates this finding by the ALJ without stating that it is supported by any, let alone, substantial, evidence. Further, in two separate reports, Dr. Santos, Forrest's other treating physician, opined that Forrest had "significant

---

[6]As noted above, in his December 2001 report, Dr. Innocencio opined that Forrest could lift and carry 20 to 50 pounds occasionally; sit 3 hours and stand/walk 1 hour in an 8-hour day; that he could sit continuously in a work setting; and that he needed to frequently get up and move around every 2 to 3 hours and sit again after thirty minutes.

18

limitations" standing, lifting, and carrying due to lower back problems. Finally, Dr. Innocencio reported that, upon examination, Forrest had swelling and stiffness of the right knee, stiffness of the back, stiffness of the lumbar area with restricted flexion, and difficulty walking during an attack. (R. 198, 217).

The ALJ further stated that Dr. Innocencio appeared to have relied too heavily on Forrest's "subjective report of symptoms and limitations," which was of "questionable reliability" as "explained elsewhere" in the ALJ's decision. However, for the reasons discussed below, the court concludes that the ALJ's determination that Forrest's testimony was not credible is not supported by sufficient evidence.[7]

The ALJ also declined to adopt Dr. Innocencio's opinion on the ground that he was a general practitioner and not a back specialist. Again, however, the ALJ fails to articulate specific grounds as to why she disregarded the opinion of Dr. Innocencio, a licensed medical doctor, simply because he was a general practitioner. The fact that Dr. Innocencio is a general practitioner is not enough to allow the ALJ to reject Dr. Innocencio's report in its entirety. 20 C.F.R. § 416.913(a)(1) (licensed doctors are an acceptable medical source).

Based on the record, the ALJ may have rejected Dr. Innocencio's opinion as a general practitioner because he referred Forrest to an orthopedist. However, if the ALJ was not satisfied by Dr. Innocencio's report, the ALJ could have ordered a consultative exam pursuant to 20 C.F.R.

---

[7]As the court notes below, ALJs may not make conclusory credibility determinations, and must articulate the reasons behind their credibility findings. *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 787 (7th Cir. 2003); SSR 96-7p. Although an ALJ's credibility determination is usually entitled to deference, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

§416.912(f), which provides that if the plaintiff's medical sources cannot give sufficient medical evidence about the impairment, the Commissioner may ask the plaintiff to undergo additional tests at the Commissioner's expense. *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000) ("the procedure for adjudicating social security disability benefit claims departs from the adversary model to the extent of requiring the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled."). If the ALJ felt that Dr. Innocencio, as a general practitioner, could not provide a proper medical basis to ascertain whether Forrest was disabled, she should have ordered a consultative exam as provided in the regulations.

b. Dr. Santos

As to Dr. Santos, the ALJ does not state whether she found her credible.[8] It appears that the ALJ rejected her testimony on the ground that it contained apparent inconsistencies. Specifically, the ALJ stated that "[t]he doctor reported no significant limitations in the claimant's activities of daily living at the time, but somewhat inconsistently reported that the claimant had 'significant limitation standing for long periods of time.'" (R.22). The purported inconsistency, however, is based on an erroneous reading of the record. Specifically, the "Cardiac Report" prepared by Dr. Santos indicated that Forrest had no significant limitations in performing activities of daily living. In contrast, Dr. Santos' "Spinal Disorders" report stated that Forrest had "significant limitation of standing, moving about, lifting, and carrying." The fact that Forrest's cardiac condition did not substantially limit him does not negate the fact that his spinal condition did so.

---

[8]Indeed, the Commissioner's motion does not clarify whether the ALJ relied on Dr. Santos' reports or not, but merely states that they were "inconsistent."

The ALJ also noted that in June 1999, Dr. Santos reported that Forrest had a diagnosis of osteoarthritis of the ankles, "[h]owever, in a report just three months later, Dr. Santos did not mention a diagnosis of osteoarthritis of the ankles, and noted diagnosis of arthritis of the lower back with onset in June 1997." A careful reading of the ALJ's own opinion, however, shows that the ALJ herself stated that in the earlier June 1999 report, Dr. Santos had also "noted diagnosis of back pain with onset 'several years ago.'" Thus, the alleged inconsistency (as so called in the Commissioner's motion) in fact did not exist.

In any event, the ALJ should have attempted to recontact Dr. Santos in order to clarify any perceived inconsistencies. 20 C.F.R. §416.913(e); SSR 96-5p ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion.").

In sum, while it is true that other than documenting a reduced range of motion of the lumbar spine, Dr. Santos did not report any significant clinical abnormalities, laboratory abnormalities, or functional abnormalities, the ALJ's finding of apparent "inconsistencies" in Dr. Santos' reports is not supported by the evidence in the record.

## B.    Forrest's Credibility

Forrest argues that the ALJ's reasoning for not crediting his statements and testimony regarding his limitations was not supported by the evidence in the record. The Commissioner argues that substantial evidence supported the ALJ's credibility findings. Under SSR 96-7p and 20 C.F.R. § 416.929(c)(3), when there is a medically determinable impairment that could reasonably be

21

expected to cause the alleged symptoms, the ALJ must consider the following factors when assessing

the credibility of an individual's statements: (i) the claimants' daily activities, (ii) location, duration,

frequency, and intensity of the pain or other symptoms, (iii) precipitating and aggravating factors,

(iv) type, dosage, effectiveness, and side effects of any medication claimant has taken to alleviate

the pain or other symptoms; (v) any measures claimant has taken to relieve the pain or other

symptoms, and (vi) other factors concerning claimant's functional limitations and restrictions due

to pain or other symptoms.

The ALJ's credibility determinations generally will not be overturned unless they were

"patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Nonetheless, ALJs may not

make conclusory credibility determinations, and must articulate the reasons behind their credibility

findings. *Brindisi,* 315 F.3d at 787; SSR 96-7p. Although an ALJ's credibility determination is

usually entitled to deference, "when such determinations rest on objective factors or fundamental

implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate

courts have greater freedom to review the ALJ's decision." *Herron,* 19 F.3d at 335.

Here, the ALJ found Forrest's testimony was not credible because it was contradicted by his

daily activities and was not substantiated by the type of medical treatment that Forrest received. As

to the first basis, the ALJ determined that Forrest's daily activities were not limited to the extent one

would expect given his complaints of disabling symptoms and limitations. The ALJ stated that

Forrest testified that although his sister did most of the household chores and cooking, he did "heavy

chores."

As an initial matter, it appears that the ALJ has overstated the extent of Forrest's activities.

The ALJ stated that Forrest did "heavy chores" such as mowing the lawn, raking leaves, and

shoveling snow. However, the record shows that Forrest testified that his sister does "most of the cooking," he does "very little" cleaning, will "sometimes" wash dishes, does "very little" grocery shopping, and that his sister does most of the laundry for him. Forrest also stated that he "sometimes" does yard work such as mowing the lawn, and that he will shovel snow "a little bit." Forrest stated that his brother did most of the shoveling. Thus, the ALJ's characterization of Forrest's testimony overstates the extent of Forrest's capabilities as testified to by him.

Further, the ALJ did not explain why she believed these activities were inconsistent with Forrest's alleged limitations. The ALJ listed Forrest's daily activities and summarily concluded that they were not consistent with what one would expect given Forrest's alleged symptoms and limitations. However, a summary listing of a claimant's daily activities is insufficient to establish that claimant is not disabled. *See Clifford*, 227 F.3d at 872 (merely listing claimant's daily activities is insufficient "because minimal daily activities, such as those in issue, do not establish that a person is capable of engaging in substantial physical activity").

Moreover, the ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activity and h[is] being able to work eight hours a day five consecutive days of the week." *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (citation omitted); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (finding that the plaintiff's activities "[were] fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry, and preparing dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain"). Forrest did not state that he had disabling pain all day every day–only when he experienced flare ups of his gouty arthritis. *Carradine*, 360 F.3d at 755-56 (noting that claimant did not allege "wracking pain every minute of the day," and that even though she could perform some daily activities when

she felt better, "[i]t d[id] not follow that she c[ould] maintain concentration and effort over the full course of the work week.").

However, when the flare-ups did occur, Forrest testified that he was unable to walk for several days. Even the VE, whose testimony the ALJ credited, stated that if one were to assume that all of Forrest's statements regarding his restrictions and limitations were true, including the twice monthly flare-ups, there would be no jobs available for such a person. Thus, the ALJ committed error by not minimally articulating how Forrest's alleged symptoms and limitations were inconsistent with his daily activities.

In discounting Forrest's credibility, the ALJ also determined that Forrest had not received the type of medical treatment one would expect for a totally disabled individual. First, she concluded that his treatment had been routine and/or conservative in nature. Second, she noted that the record reflected significant gaps in Forrest's treatment history, despite Forrest's claim that he has been disabled since 1991. Third, the ALJ reasoned that all treatment was rendered by a general practitioner and Forrest had not sought or received treatment from a specialist.

With respect to the ALJ's emphasis on the routine and/or conservative nature of Forrest's treatment, she did not minimally articulate any medical evidence from the record that would support her conclusion that a person who receives routine and/or conservative treatment cannot by definition, be disabled. *Scivally*, 966 F.2d at 1077 (stating that the ALJ improperly did not rely upon any medical report or opinion to support the conclusion that the limitations could not be produced by claimant's medical condition). The court notes that Forrest's treating physician, Dr. Innocencio, suggested that Forrest get x-rays and see an orthopedist. However, Forrest stated he did not obtain the x-rays because his General Assistance Medical Card did not cover the x-rays. And when asked

why he did not go to Cook County Hospital to have x-rays performed for free, Forrest testified that

he tried but that the hospital told him he would have to wait several hours and then was told that he

did not need the x-rays and would not be given them.[9]  Thus, while Forrest's treatment may have

appeared conservative, the ALJ does not take into account the evidence that additional testing by a

specialist was requested but did not occur due to either claimant's financial inability or

administrative roadblocks.  *Zurawski*, 245 F.3d at 888 ("Both the evidence favoring the claimant as

well as the evidence favoring the claim's rejection must be examined, since review of the

substantiality of evidence takes into account whatever in the record fairly detracts from its weight.").

(citation omitted).

The court also notes that in her brief, the Commissioner attempts to support the ALJ's

determination that Forrest's treatment history did not reflect a disability by stating that Forrest never

had back surgery.  As an initial matter, the ALJ did not state this in her opinion.  *McGinnis-Overton*

*v. Barnhart*, No. 02 C 5726, 2003 WL 22006252, at *6 (N.D. Ill. Aug. 20, 2003) ("Unfortunately

for the Commissioner, we do not review her brief . . . to determine if it is supported by substantial

evidence.  We must confine ourselves to the conclusions of the ALJ....").  In addition, this court

agrees that the fact that Forrest did not have back surgery is not conclusive as to whether Forrest is

disabled.  *Id*. at *5 ("We are reluctant to require a plaintiff undergo back surgery before he or she can

be found disabled.").

---

[9]Forrest specifically testified that "I was going to go there [Cook County Hospital] for some x-rays, and I got my papers here now about that.  And he wouldn't give me the x-rays, he said you don't need the x-rays sir, I don't have to give you the x-rays, he said."  R. 256.  Despite Forrest's testimony that someone at Cook County Hospital told him he did not need x-rays, it is not clear who made this determination and whether it was based on an actual medical examination by a doctor.

25

As to the gaps in his treatment history, the ALJ did not identify the gaps.  According to the Commissioner's motion, the gaps refer to the fact that Dr. Innocencio's December 2001 report stated that Forrest first complained of back pain in March 2000, which, according to the Commissioner "belies" the existence of a disability since 1991.  However, the ALJ stated under the "Evaluation of the Evidence" section of her decision that "this decision addresses the issue of disability only with respect to the period since the claimant's application date [for SSI benefits] of May 26, 1999." R.20. Thus, the ALJ's reliance on an alleged gap since 1991  is misplaced.  Further, the court notes that Forrest's other treating physician, Dr. Santos, stated in her June 1999 report that plaintiff was diagnosed with chronic back pain "several years ago."  Thus, the ALJ's conclusion that a gap in treatment existed is not supported by substantial evidence.

Finally, the ALJ found Forrest to be not credible on the ground that he was treated only by a general practitioner and had not seen a specialist.  Again, however, as noted above, this failure is at least in part due to Forrest's lack of financial resources, which does not appear to have been considered by the ALJ.  Further, the ALJ failed to articulate why a specialist is necessary to diagnose arthritis or back pain.  In the instant case, both of Forrest's treating physicians concluded that Forrest had significant limitations standing, walking or moving.

For the reasons stated above, substantial evidence does not support the ALJ's finding that Forrest was not credible.

# V.   CONCLUSION

For the foregoing reasons, the Commissioner's motion for summary judgment is denied, and Forrest's motion for remand is granted.  This case is therefore remanded pursuant to sentence four of 42 U.S.C § 405(g), for further administrative proceedings consistent with this Order.

ENTER:

*Blanche M. Manning*

**Blanche M. Manning**
**United States District Judge**

**DATE:** August 29, 2005