## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| KRISTINE HENRIKSEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No: 07 C 6142 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Kristine Henriksen, seeks review of the final decision of the Commissioner of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Ms. Henriksen asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.
### PROCEDURAL HISTORY

Ms. Henriksen applied for DIB on April 14, 2005, alleging that she had been disabled since January 1, 2003, as a result of obesity and pain and stiffness in her knees. (Administrative Record ("R.") 55-57, 216-18). Her application was denied initially and upon reconsideration. (R. 33-39, 46-49). Ms. Henriksen continued pursuit of her claim by filing a timely request for a hearing on February 22, 2006. (R. 53).

An administrative law judge ("ALJ") convened a hearing on April 12, 2007, at which Ms. Henriksen, represented by counsel, appeared and testified. (R. 205-237). In addition, William Newman testified as a vocational expert. (R. 205, 230-37). On April 27, 2007, the ALJ issued a decision denying Ms. Henriksen's application for DIB

because she retained the capacity to perform her past relevant work. (R. 15-23). This became the final decision of the Commissioner when the Appeals Council denied Ms. Henriksen's request for review of the decision on August 28, 2007. (R. 4-6). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Henriksen has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II
## THE EVIDENCE

### A.
### Vocational Evidence

Ms. Henriksen was born on January 4, 1954, making her fifty-three years old at the time of the ALJ's decision. (R. 23, 55). She stands 5' 5" tall, but her weight ranges from 327 to 370 pounds. (R. 102, 112, 218). She has a college degree. (R. 211). Her work history over the last fifteen years consists of several jobs in the information technology industry, where she worked as a director, manager, technical writer, or a consultant. (R. 70-78, 211-12). These jobs were performed mostly while sitting, but did require some carrying – such as files or a laptop computer – and walking – from the commuter train or between offices. (R. 71-77). Ms. Henriksen lost her last job when the company she was working for went out of business in 2001, and she has not worked since. (R. 211).

2

**B.**
**The Medical Evidence**

**1.**
**The Plaintiff's Treating Physician**

Ms. Henriksen's conditions are long-standing, and over the years her treating physician has been Dr. Elsa Hernandez Outly. In 2001, while Ms. Henriksen was still working, Dr. Outly reported her weight as ranging from 327-330 pounds. (R. 110-12). She was going to weight watchers. (R. 112). Her blood pressure "seem[ed] to be doing okay," although it was elevated at 164/110 on March 8th, and at 160/94 on June 28th. (R. 110, 112). Aside from that, her physical examination on June 28th was essentially normal. (R. 111). Ms. Henriksen was taking Cozaar and Lopressor for high blood pressure, and Allegra for allergies. (R. 111).

In January of 2002, Ms. Henriksen reported that she had been laid off, but had a COBRA health insurance plan and severance pay and was not really worried. (R. 108). Her blood pressure was 130/60, and her weight was 332 pounds. (R. 108). It was noted that she was taking Vioxx for arthritis, but physical examination revealed no joint pain. (R. 107). In November 2002, Dr. Outly reported that Ms. Henriksen came in for a "follow up of hypertension, depression, osteoarthritis and seasonal allergies." (R. 106). She said the Vioxx was not helping her knee pain, and the Celexa she had been taking was not controlling her depression. (R. 106). The record through this date made no mention of medication for depression, and indicated that there was no depression or joint pain present during Dr. Outly's previous examinations. (R. 107, 111). Her weight was 335 pounds and her blood pressure was 168/86. (R. 106).

On December 9, 2002, Ms. Henriksen went to see Dr. Outly for a disabled parking placard. She said she was having difficulty walking. (R. 105). Her weight was 335 pounds and her blood pressure was 180/90. (R. 105). There was some swelling and crepitus in both knees. (R. 105).

On January 20, 2003, Ms. Henriksen went in to see about a change in her depression medication, and to follow up on her hypertension. She had no other complaints. (R. 104). Physical exam was normal aside from her weight – 335 pounds – her blood pressure – 128/90 – and a trace of edema in her extremities. (R. 104). In April of 2003, Ms. Henriksen was doing well. (R. 103). She said she had not been looking for another job yet. (R. 103). She weighed 335 pounds, and her blood pressure was 160/100. (R. 103). Other than that, physical examination was normal. (R. 103).

By February 18, 2004, Ms. Henriksen weighed 370 pounds. (R. 102). Blood pressure was 166/108. (R. 102). Her depression was well-controlled with medication. (R. 102). Dr. Outly told her she must lose weight. (R. 102). On May 17, 2004, Ms. Henriksen's weight had decreased to 350 pounds. (R. 101). Her blood pressure was 124/84. (R. 101).

In March of 2005, Ms. Henriksen's weight was 352; her blood pressure was 154/102. (R. 100). She said she had been doing well. (R. 100). There was a trace of edema in her extremities. (R. 100). On September 19, 2005, Dr. Outly noted that Ms. Henriksen was not sticking to her diet. (R. 152). On October 17, 2005, Ms. Henriksen reported that she was doing relatively well, but was not following her low salt diet. (R. 151). Her blood pressure was 136/100. (R. 151). On December 5, 2005, she reported that her arthritis was bothering her. (R. 150). She had been more diligent managing her

salt intake. (R. 150). She asked that her depression medication be decreased as it was causing her to sweat. (R. 150). There was severe crepitation in both her knees. She said she was unable to walk long distances without assistance. (R. 150).

On December 19, 2005, Dr. Outly completed a functional capacities assessment for Ms. Henriksen's attorney. Her diagnoses were morbid obesity, hypertension, and severe osteoarthritis. (R. 154). She said Ms. Henriksen suffered severe pain in her knees when she walked more than 50 feet, and complained of fatigue and shortness of breath. (R. 154). There was reduced range of motion in her knees and hips, as well as tenderness and muscle weakness. (R. 154). Dr. Outly added that depression affected Ms. Henriksen's condition as well. (R. 155). "[P]ain or other symptoms" would frequently affect her ability to concentrate, and the doctor thought she was incapable of even a low stress job. (R. 155). There were no side effects from her medications that affected her ability to work, however. (R. 155). Dr. Outly opined that Ms. Henriksen could not walk even one city block without pain or discomfort, could sit for just thirty minutes at a time, stand for just 10 minutes at a time, stand and/or walk less than two hours total, and sit about 2 hours total throughout a work day. (R. 155-156). She would have to walk for 3 minute periods every hour, would have to change positions at will, take unscheduled breaks, and use an assistive device when occasionally standing and walking. (R. 155-56). She could rarely lift and carry less than 10 pounds and never lift/carry over 10 pounds in a competitive work environment, never twist, stoop, crouch and climb, and had limitations in repetitive fingering, handling and reaching. (R. 156-57). Dr. Outly assessed that Ms. Henriksen would likely miss more than four days of work a month due to her impairments. (R. 157).

On May 8, 2006, Ms. Henriksen reported experiencing "a lot of problems due to her arthritis." (R. 176). Her blood pressure was 106/80. (R. 176). Tests results were normal aside from slightly elevated glucose, elevated cholesterol at 249, elevated triglycerides at 681, and elevated TSH at 6.458. (R. 187-88). After reviewing the test results, Dr. Outly told Ms. Henriksen she had some hypothyroidism, and prescribed Synthroid. (R. 175).

### 2.
### Consultative and Reviewing Physicians

On May 12, 2005, the Agency arranged for Ms. Henriksen to undergo a consultative psychiatric evaluation by Dr. Kiran Frey, M.D. (R. 123-26). Ms. Henriksen moved slowly due to her weight, but her gait was normal. She was pleasant and cooperative, warm and engaging, intelligent and articulate. (R. 123, 125). She said she had been depressed for 30 years, but was on medication and it was stabilized and under control. (R. 123). She did not feel helpless or hopeless. She did not bother going on job interviews, however, because employers did not hire obese people. (R. 123). Her mood was good and it seemed her depression was in the past. (R. 124). She exhibited a good range of emotional display and had no difficulty concentrating. (R. 124). Both recent and remote memory were intact. (R. 125). Her fund of information and calculating ability were both fine. (R. 125).

Ms. Henriksen described her daily activities as reading, watching television, gardening, and crafts. (R. 124). She takes her mother out to lunch and does errands. (R. 124). She is involved with her sister and niece. (R. 124). She attends weight watchers regularly. (R. 124). Her only impairment consisted of moving around. (R. 124). Dr. Kiran felt her prognosis was good, and that she was resilient and engaged. (R. 126). The

doctor diagnosed major depressive disorder in remission and, surprisingly given the balance of her report, said Ms. Henriksen's "functioning is reduced 80% because of her depression." (R. 125).

On the same date, Ms. Henriksen also underwent a consultative physical examination by Dr. Ahmari M. Shakih, M.D. (R. 127-30). Ms. Henriksen listed her physical complaints as pain in both knees and both shoulders, obesity, and hypertension. (R. 127-28). She said her knees had bothered her since high school, but they had worsened since about 2000. (R. 127). She could still do her own housework and chores, but grocery shopped only sporadically, and had trouble with stairs. (R. 128). Her shoulder pain began in 2003, but had improved recently and only occurred after use. (R. 128). She had been obese since childhood. (R. 128). Contrary to what she had told Dr. Frey, Ms. Henriksen said she had been depressed for only 5 years – not 30. (R. 128).

Ms. Henriksen weighed 370 pounds and her blood pressure was 160/106. (R. 129). Her range of motion was normal in all joints except her knees and hips. Right knee flexion was 110° out of 150°; left knee flexion was 100°. Hip flexion was limited to 80° out of 100° due to obesity. (R. 132). Her gait was slow and she favored her left leg, but she did not use an assistive device. (R. 129). She could walk about 50 yards but would have difficulty standing for prolonged periods due to her obesity. (R. 129). There was no tenderness or swelling in any of her joints. (R. 129). She exhibited no problems with her upper extremities: grip strength and motor skills were normal. (R. 130). An x-ray of her left knee revealed moderate degenerative joint disease. (R. 136).

On May 24, 2005, Dr. Charles Kenney reviewed Ms. Henriksen's medical record at the request of the Agency. He concluded that she could perform work that involved

lifting and/or carrying up to twenty pounds occasionally and ten pounds frequently, standing and/or walking at least two hours in an eight-hour workday, sitting about six hours in an eight-hour workday, no climbing ladders, ropes, or scaffolds, and occasional climbing of ramps and stairs. (Tr. 115-22). Dr. Carl Hermsmeyer performed a similar review of the psychiatric evidence on June 28, 2005, and concluded that Ms. Henriksen did not have a severe mental impairment. He thought she suffered only mild limitations in her daily activities, mild difficulty in social functioning, and mild difficulty in concentration and persistence. (Tr. 136-49).

Dr. Ernst Bone reviewed the medical evidence on December 16, 2005, and concluded that Ms. Henriksen could perform sedentary work that involved only occasional kneeling, crouching, and crawling. (Tr. 158-65).

On October 3, 2006, Dr. Anthony Brown, M.D. performed a consultative orthopedic evaluation. (Tr. 166-72). Ms. Henriksen complained of pain in her knees and shoulders. (Tr. 166). Dr. Brown commented that she arose from a chair in a labored manner and walked with a slow gait "of a waddling nature." (Tr.167). He noted reduced range of motion in her knees, and a full range of motion of her shoulders (Tr. 167). Dr. Brown determined that Ms. Henriksen could perform work that involved: lifting/carrying less than ten pounds; standing and/or walking less than two hours in an eight-hour workday; unlimited sitting; occasional kneeling, crouching, crawling, and stooping; and no climbing or balancing. (Tr. 169-72). Not surprisingly, he recommended weight reduction. (R. 168).

## C.
### Administrative Hearing Testimony

### 1.
### Plaintiff's Testimony

Ms. Henriksen testified that she has been overweight since she was a child. (R. 216). Every doctor she has ever seen has told her to lose weight. (R. 216). She has accepted her condition. (R. 216). She tries to diet, and from time to time she loses some weight. (R. 218). She is just happy she does not weigh seven- or eight-hundred pounds. (R. 218). She explained that she has had problems with her knees since high school. (R. 216).

She researched knee replacement surgery but did not think she could do the rehabilitation it required. (R. 217). She said the pain in her knee felt like the bones rubbing together. (R. 220). It was sharp and continuous. (R. 220). She also said her shoulders hurt constantly. (R. 220). She can only sleep in certain positions and woke up when she moved. (R. 220). The medication only took the edge off her pain. (R. 222). Her medication also makes her sleepy and adversely affects her concentration when she tries to read. (R. 222). The only time she has been pain-free in the recent past is when she was given three shots of Demerol in the hospital. (R. 221). She uses a cane to walk around her house, but was unclear as to whether her doctor had prescribed it. (R. 223).

Ms. Henriksen said she thought she could lift ten pounds. (R. 223). She can stand without support for about two minutes, and she can sit for a couple of hours as long as she can move around. (R. 223). She cannot even walk one block. (R. 223). She does some limited driving to her sister's house and the grocery store. (R. 210-11, 225). She does things in small increments, such as cooking simple items, washing dishes, and doing

9

laundry. (R. 224). She cannot even read for more than limited stretches of time. (R. 227). She does some arts and crafts while lying in bed. (R. 225). She performs stretching exercises every day. (R. 227). She said she had not gardened in years, and hires someone to mow the lawn. (R. 226). She can sometimes shovel a path in the snow in the winter, but it takes three sessions to complete a 40-foot walkway. (R. 226). She sweats profusely and tires easily. (R. 228-29). When the ALJ asked Ms. Henriksen why she could not return to her former computer jobs that seemed to involve a lot of sitting, she explained that they also involved walking from office to office, up and down stairs, and carrying large manuals. (R. 214-15).

### 2.
### Vocational Expert's Testimony

The VE described all of Ms. Henriksen's past work as skilled, light work, except the technical writing job, which was skilled, sedentary work. (R. 230-31). The ALJ asked the VE to consider an individual of Ms. Henriksen's age, education, and work experience, who was limited to two hours of standing and walking, six hours of sitting, able to frequently carry less than 10 pounds, occasionally carry up to 10 pounds, could perform no repetitive movements her feet or legs, could only occasionally crawl, crouch, kneel, and could never climb ladders, ropes, or scaffolds. (R. 231). The VE testified that such an individual would be able to perform Ms. Henriksen's past relevant work as a technical writer. (R. 231). Then, the ALJ asked the VE to consider the residual functional capacity found by Dr. Brown: lifting/carrying less than ten pounds; standing and/or walking less than two hours in an eight-hour workday; unlimited sitting; occasional kneeling, crouching, crawling, and stooping; and no climbing or balancing.

(Tr. 232).    The VE said that a person with such restrictions could also perform Ms. Henriksen's past work as a technical writer. (R. 232).

Ms. Henriksen's attorney then asked the VE to add to the ALJ's first hypothetical interruptions in the person's ability to pay attention and concentrate due to pain and other symptoms more than one-third of the workday, and the VE responded there would be no work as she would be off task too frequently. (R. 232-34). The VE then testified that, for skilled work, the individual could be off task 10 to 15 minutes every hour and still sustain employment since it is not a repetitive production-type job, although a certain amount of work per day would be expected. (R. 234). In response to further questioning from counsel, the VE indicated that a technical writer could only miss one day of work a month or 12 days a year, that it was not generally considered a low stress job, and, not surprisingly, that one could not take hour-long breaks or lay down throughout the day and hold down the job. (R. 236).

### III
### THE ALJ'S DECISION

The ALJ found that Ms. Henriksen had not engaged in substantial gainful activity since her alleged onset date of January 1, 2003. (R.17). She determined that Ms. Henriksen had the following severe impairments: bilateral knee pain secondary to degenerative joint disease, morbid obesity, hypertension, and a history of depression. The ALJ concluded that none of these impairments, singly or in combination, met or equaled a listed impairment. (R. 18). The ALJ then reviewed the medical evidence and Ms. Henriksen's testimony, and concluded that she retained the capacity to lift and carry ten pounds occasionally and lesser weights frequently, stand or walk for at least two hours and sit for six hours in a workday, perform activities not requiring repetitive

11

movement of her lower extremities, occasionally crawl, crouch, kneel and stoop, but do no climbing. (R. 18). Any restrictions stemming from her depression were no more than "mild." (R. 18).

Considering Ms. Henriksen's complaints, the ALJ found that although her medically determinable impairments could be expected to produce the types of symptoms she alleged, her statement concerning the intensity and limiting effect of her symptoms were not entirely credible. (R. 22). She said that treatment has been generally successful in controlling Ms. Henriksen's symptoms, but it had not been consistent with what one would expect if she were truly disabled. (R. 22). The ALJ gave little weight to the opinion of Dr. Outly because it was unsupported by objective tests or significant findings; there were no x-rays or scans aside from a left knee x-ray demonstrating moderate degenerative joint disease. (R. 22). Ms. Henriksen's condition appeared to be no worse than when she was working. (R. 22). There was no support in the record of treatment for Dr. Outly's finding that Ms. Henriksen was severely limited in her ability to concentrate. (R.22). She thought Ms. Henriksen's daily activities were "fairly extensive," including "crafts and reading." (R. 22).[1] She also noted that the RFC determinations from the Agency reviewing physicians supported a finding of "not disabled." (R. 23).

The ALJ then turned to the VE's testimony. She noted that the VE described Ms. Henriksen's past work as a technical writer as skilled and sedentary. (R. 23). She further noted that the VE testified that an individual with the foregoing RFC would be capable of performing Ms. Henriksen's past job as a technical writer. (R. 23). Based on this

---

[1] As we shall see, this finding is flatly unsupported by the facts that the ALJ accepted.

testimony, the ALJ concluded that Ms. Henriksen retained the capacity to perform her past relevant work and was, therefore, not disabled under the Act. (R. 23).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for the decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176;

*Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544.

**B.**
**Five-Step Sequential Analysis**

Section 423(d)(1) defines "disability" as: "(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day*, 467 U.S. 104, 107 n.1 (1984); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
>
> 2) does the plaintiff have a severe impairment;
>
> 3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
>
> 4) is the plaintiff unable to perform his past relevant work; and
>
> 5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir.

2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).  An affirmative answer

leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled.

20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir.

1989).  A negative answer at any point, other than step 3, stops the inquiry and leads to a

determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at

44.  The plaintiff bears the burden of proof through step four; if it is met, the burden

shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.
## Analysis

### 1.

Ms. Henriksen finds a host of faults with the ALJ's decision denying her benefits.

Some of her criticisms amount to little more than "nitpicking," *Rice v. Barnhart*, 384

F.3d 363, 369 (7th Cir. 2004), or demanding a perfect decision. *See Fisher v. Bowen*, 869

F.2d 1055, 1057 (7th Cir. 1989).  Others are undeveloped.  For example, Ms. Henriksen

submits in a single sentence that the ALJ failed to follow Social Security Ruling SSR 02-

1p on obesity; she does not explain how. (*Memorandum in Support of Plaintiff's Motion*

*for Summary Judgment*, at 19).   Such a perfunctory contention does not merit

consideration. *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 762 (7th Cir. 2008).

Moreover, the ALJ said she was following SSR 02-01p and considered Ms. Henriksen's

obesity throughout her opinion, which is essentially what the ruling requires.  SSR 02-

01p, 2000 WL 628049.  That sought to suffice, even if the consideration did not go Ms.

Henriksen's way. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007).

Some of Ms. Henriksen's other critiques are incorrect. For example, she says that the ALJ impermissibly ignored the fact that her medication has side effects that impinge on her ability to work. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 12). But Ms. Henriksen's own treating physician indicated that there were no such side effects. (R. 155). She also calls the ALJ to task for rejecting Dr. Outly's report that she has difficulty concentrating simply because Dr. Outly had not mentioned such a limitation in any of her treatment notes. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 14). Without support from any case law, Ms. Henriksen argues that the ALJ could not reject Dr. Outly's assessment simply because it was not reflected in her treatment notes. But the absence of supporting clinical findings *is* an acceptable reason for according lesser weight to a treating physician's opinion. 20 C.F.R. § 404.1527(d)(3); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). More significantly, Dr. Outly's treatment notes do not simply fail to mention complaints of difficulty concentrating as Ms. Henriksen suggests. Instead, the only two times Dr. Outley addresses concentration at all in her notes, she lists such a symptom as "Not Present." (R. 108, 111). So Dr. Outly's opinion that Ms. Henriksen cannot concentrate is not merely unsupported by her notes, it's inconsistent with them.

Elsewhere, Ms. Henriksen argues that the ALJ improperly relied on the opinions of the Agency physicians, which she claims "can never be substantial evidence to support an ALJ's decision," relying on Social Security Ruling ("SSR") 96-6p and *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 12). The two sources say nothing of the kind.

SSR 96-6p directs ALJs to consider Agency physician opinions as expert opinions of non-examining sources, and indicates that they must be assessed in manner not unlike that applicable to opinions from treating sources.  SSR 96-6p, 1996 WL 374180, *2.  Quite the contrary to Ms. Henriksen's stance, the SSR allows that in some cases, such opinions may be entitled to greater weight than those of treating physicians. 1996 WL 374180, *3; *see also Cunningham v. Barnhart*, 440 F.3d 862, 865 (7th Cir. 2006).

*Gudgel* simply states that "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, *by itself*, suffice."  345 F.3d at 470 (emphasis supplied).  That is simply a derivative of the treating physician rule.  If the non-examining physician's opinion stands alone, it is not supported by other medical evidence in the record.  If it is consistent with other medical evidence in the record, then there is evidence in the record beyond the non-examining physician's opinion that is contrary to the treating physician's opinion, thereby undermining the treating physician's assessment.  *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006).

But this is not a one-sided case and many of Ms. Henriksen's criticisms are correct.  After all, Ms. Henriksen's Body Mass Index ("BMI") ranges from 54.4 to 61.6, http://www.nhlbisupport.com/bmi/., meaning she is well above the standard (a BMI of 40) for Level III (out of three) extreme obesity.  SSR 02-01p, 2000 WL 628049, *2. Under the Commissioner's former listing 9.09(A) for obesity, she would be presumptively disabled given her weight and the x-ray evidence of arthritis in her left knee. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000); *Combs v. Commissioner of*

*Social Security*, 459 F.3d 640, 662 (6th Cir. 2006). A woman of Ms. Henriksen's height –
5'5"– would have met the weight requirement under the former listing at just 266 pounds.
Ms. Henriksen is at times 100 pounds beyond that.
http://www.disabilitydoc.com/obesity-and-disability/.

### 2.

There are at least two of Ms. Henriksen's arguments that point out shortcomings
that require a remand. First, there is Dr. Frey's assessment that Ms. Henriksen's mental
impairment results in an 80% reduction in her ability to function. As already noted, this
was a bit surprising given Dr. Frey's report of his consultative psychiatric examination.
The doctor's comments all indicated that Ms. Henriksen's depression was controlled, in
remission, and did not result in any debilitating symptoms. The Commissioner argues
that the "80% reduction" assessment must have been a typographical error. Perhaps, but
that's not what the ALJ says; the ALJ simply ignores the assessment. (R. 22). And it is
the ALJ's evaluation of the evidence – not the Commissioner's lawyer's – that must be
reviewed. *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003)(" . . . general
principles of administrative law preclude the Commissioner's lawyers from advancing
grounds in support of the agency's decision that were not given by the ALJ."). The
Seventh Circuit has recently reversed an ALJ's decision for a failure to mention a similar
dire assessment that also seemed inconsistent with the balance of the psychiatrist's
conclusions for the same reason: it was impossible to tell what the ALJ might have
thought of it. *Craft v. Astrue*, – F.3d –, –, 2008 WL 3877299, *7 (7th Cir. Aug. 22, 2008)

The ALJ had a few options available to her to address the severe restriction Dr.
Frey found. She could have determined – and explained – that Dr. Frey's opinion was

18

not supported by the appropriate medical signs and findings.[2]    20 C.F.R. §
404.1527(d)(3); *Sanchez v. Barnhart*, 467 F.3d 1081, 1085 (7th Cir. 2006).  She could
have contacted Dr. Frey in order to alleviate the incongruity in the report.  20 C.F.R. §
404.1527(c); *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004).  She could have said
she thought it was a typo, and – again – explained why.  But she did none of these things,
and failed to address it at all.  That leaves a reviewing court nothing but speculation, and
that's not the point of this exercise.

An ALJ must "minimally articulate h[er] reasons for crediting or rejecting
evidence of disability." *Clifford*, 227 F.3d at 870; *Briscoe*, 425 F.3d at 354. The Seventh
Circuit has called this "building a logical bridge" from the evidence to the conclusion.
*Giles*, 483 F.3d at 486. The requirement is neither unique to ALJs nor does it impose
some heightened obligation on them.[3] The principle governs decision-making at all levels
of the federal judiciary as well. *See, e.g., United States v. Elliott*, 467 F.3d 688, 690 (7th
Cir.2006); *Szmaj v. AT & T*, 291 F.3d 955, 956 (7th Cir.2002) (Posner, J.) (Referring to a
particular case as weak authority "because there is no discussion of the point, only a
conclusion."); *United States v. Eiselt*, 988 F.2d 677, 680 (7th Cir.1993) ("'Reasons'
means something more than conclusions – a distinction important not only to the

---

[2] Misstatement or not, the 80% reduction opinion was at least consistent with Ms. Henriksen's
treating physician's conclusions that Ms. Henriksen was incapable of performing even a low stress
job.

[3] This is not to say that ALJs are not under serious constraints as a result of their case loads.  In 2005,
The top ten percent of ALJs in terms of production each issued more than 578 decisions.  http://ways
andmeans.house.gov/hearings.asp?formmode=view&id=6087.  The median productivity rate that
year was 383 decisions.  Coupling each of those with a hearing results is staggering amount of work.
And while courts and claimant's attorneys press ALJs for well-reasoned opinions, claimants and
politicians desire speedier resolutions to the application procession.  Necessarily, the better the
logical bridge, the slower the resolution.  The speedier the resolution, the lesser the logical bridge.

defendant ... but also to the appellate process."). *Cf. Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171 (1951) (Frankfurter, J., concurring) (the validity and moral authority of any conclusion largely depends on the mode by which it was reached); Henry M. Hart, Jr., *Foreword: The Time Chart Of The Justices*, 73 Harv.L.Rev. 84, 98-99 (1959) ("In the end, however, *ipse dixits* are futile as instruments for the exercise of 'the judicial power of the United States.' ").[4] Here, the ALJ provides no rationale for why she rejected Dr. Frey's opinion that Ms. Henriksen's ability to function was reduced by 80% as a result of her depression. Indeed, she does not even indicate that she considered it and rejected it.

It would not be at all surprising to find out that Dr. Frey's assessment of Ms. Henriksen's inability to function was indeed a misstatement. There is no way to tell for certain at this point, however. More importantly, there is no way to tell what the ALJ might have thought of it. In the main, the Seventh Circuit has been adamant about requiring ALJs to explain their reasoning. *See Giles*, 483 F.3d at 487("We have not

---

[4] *But compare* Richard A. Posner, How Judges Think, 110-111 (2008) ("The role of the unconscious in judicial decision making is obscured by the convention that requires a judge to explain his decision in an opinion. The judicial opinion can best be understood as an attempt to explain how the decision, even if (as is most likely) arrived at on the basis of intuition, could have been arrived at on the basis of logical, step-by-step reasoning. That is a check on the errors to which intuitive reasoning is prone because of its compressed, inarticulate character; hence the value of a judge's having a suite of emotions that does not cut him off from considering challenges to his intuitive take on a case. Beware the happy or the angry judge!

It is an imperfect check, however, because the vote on how the case shall be decided precedes the opinion; and though it might be otherwise, most judges do not treat a vote, though nominally tentative, as hypothesis to be tested by the further research conducted at the opinion-writing stage. That research is mainly a search for supporting arguments and evidence. Justificatory rather than exploratory, it is distorted by confirmation bias – the well-documented tendency once one has made up one's mind, to search harder for evidence that confirms rather than contradicts one's initial judgment. But since it is a public document, it can be scrutinized for conformity to the norms of the judicial process, and in particular for the degree to which it gives legalism its due.")(Parentheses in original)(Footnotes omitted).

hesitated to remand an ALJ's decision that does not sufficiently articulate the basis for the denial of benefits."). But the level of explanation required has proven somewhat elusive, *see Cunningham v. Barnhart*, 440 F.3d 862, 865 (7th Cir. 2006)("The medical evidence supports the ALJ's decision, although he did fail to adequately explain the connection."); *Rice*, 384 F.3d at 369(despite "logical bridge" requirement, reviewing court should not "nitpick at" an ALJ's decision), and the Seventh Circuit has not infrequently required a sturdier "logical bridge" than the district court has. *See e.g., Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir 2007); *Giles*, 483 F.3d at 487; *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006); *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006); *Briscoe*, 425 F.3d at 354. Here, the level of explanation the ALJ provided seems to have fallen just short of the Seventh Circuit's standard, and a remand is required.

### 3.

Next, there is the ALJ's credibility determination or, more to the point, her stated reasons for disbelieving Ms. Henriksen's complaints. The ALJ said that "the subjective record does not support the claimant's allegations of complete disability." (R. 22). SSRs and case law call for consideration of certain subjective evidence when assessing a claimant's credibility. *See* SSR 96-7p (requiring ALJ to consider a claimant's statements as to: daily activities; location, frequency, duration, and intensity of pain or other symptoms; factors that precipitate and aggravate those symptoms); *Rice*, 384 F.3d at 371 (same). And here, the ALJ specifically based her credibility finding, in large part, on Ms. Henriksen's daily activities and her observation of Ms. Henriksen at the hearing. The ALJ said that Ms. Henriksen "does fairly extensive daily activities." (R. 22).

The ALJ's treatment of the "subjective record" is troubling for two reasons. First, the Seventh Circuit has repeatedly cautioned against equating an ability to engage in sporadic physical activities at home with the ability to work eight hours a day, five consecutive days of the week. *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004); *Clifford*, 227 F.3d at 872; *Shramek v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000). Of course, there are occasions where an individual's level of activity might belie their allegations of disabling pain. Second, Ms. Henriksen's daily activities are not extensive at all, as the ALJ's own summary of Ms. Henriksen's activities shows. The ALJ relates that Ms. Henriksen:

> performs very limited activities, tires very easily, and socializes less. . . .
> Her hands become numb when holding newspapers and books. She can
> no longer wear tie shoes because she is unable to bend her knees enough
> to tie them. She uses a retrieval device to help her reach things because
> she can no longer stoop or bend her knees enough to do things anymore.
> She only cooks things that take up to ten minutes to prepare. . . .She has
> difficulty getting in and out of a car, rising from a seated position, using a
> bathtub or shower, and going up and down stairs. She needs the
> assistance of another person when walking or standing. . . . She needs to
> take frequent rest breaks throughout the day after attempting to perform
> any physically exertional activities. She shops only when necessary and
> only for short periods of time. She spends more time in bed and does little
> in or outside the home.

(R. 19-20). That is not a list of "fairly extensive daily activities." In fact, it is not extensive at all: it is less taxing than the list found unimpressive in *Carradine*, 360 F.3d at 751, and perhaps rivals the list in *Clifford*, 227 F.3d at 873 for being extremely limited. Basically, the ALJ exaggerated the level of activity Ms. Henriksen engages in, and employed that exaggeration as a basis for finding her not credible. Such a credibility determination cannot be upheld.

22

A further, more specific example: the ALJ makes special reference to Ms. Henriksen's "crafts and reading." (R. 22). Even at face value, neither of those activities would necessarily be inconsistent with disabling pain, but they are far more insignificant upon closer examination. At the hearing, the ALJ had the following brief exchange with Ms. Henriksen about her hobby:

> Q: Doctor records show that you have a hobby of making copper animals that have beads on them or something like that –
>
> A: I do.
>
> Q: Do you still do that?
>
> A: Yes, I do.
>
> Q: How often do you do that?
>
> A: Maybe a couple times a week.
>
> Q: And for how long each time?
>
> A: Maybe an hour.
>
> Q: It also - -
>
> A: Do those lying in my bed.

(R. 225). Obviously, two hours a week of horizontal crafts says little to nothing positive about a capacity for work, or whether a person is suffering debilitating pain. If it says anything, the fact that Ms. Henriksen can only engage in her hobby lying down says that her capacity for activities is extremely limited.

So, too, her reading. Ms. Henriksen said she reads for a couple of hours a day. (R. 226). Again, under cases like *Carradine* and *Clifford*, this is not significant – it does not really equate to an ability to concentrate throughout an eight-hour workday, five days

a week. But when one considers how Ms. Henriksen actually spends those couple of

hours, even that small significance vanishes:

> Q: When you are reading for a couple hours at a time, how well are you remember[sic] and following what you're reading?
>
> A: I don't read for a couple hours at a time, I read for about 15 or 20 minutes, and then I will go back, so it's cumulative reading time over a day.
>
> Q: Okay.
>
> A: I can pretty much what [sic] I read for 15, 20 minutes, yeah. That's about it. My hands get numb, my arms get numb when I hold a book for even 10 minutes, that's why I tend to read for very short amounts of time and I read things that don't require that I remember them. I read books that I can go back and read the last couple pages to –

(R. 227-28). Fifteen minutes is not exactly the type of sustained effort that would pass

muster at the workplace. And again, this type of activity simply does not support the

ALJ's credibility finding, which was based on "fairly extensive" daily activities.

Accordingly, a remand is necessitated.

### CONCLUSION

The plaintiff's motion for summary judgment or remand [#20] is GRANTED, and

the Commissioner's motion for summary judgment [#24] is DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 9/9/08

24